AO106 (Rev. 12/03)  Affidavit for Search Warrant

*unsealed 3·6·08 do*

# UNITED STATES DISTRICT COURT

**ORDERED SEALED BY COURT**

SOUTHERN                                                      DISTRICT OF    CALIFORNIA

08 MAR -5 AM 11: 32

CLERK, U.S. DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA

In the Matter of the Search of
(Name, address or brief description of person, property or premises to be searched)

**APPLICATION AND AFFIDAVIT
FOR SEARCH WARRANT**

2825 Red Rock Canyon Road
Chula Vista, CA

BY_____ DEPUTY

Case Number:

**08 MJ 0679**

I,   Special Agent Brett O'Connor _____ being duly sworn depose and say:

I am a(n)  Special Agent for the Drug Enforcement Administration _____ and have reason to believe
                                        Official Title

that   ☐ on the person of or    ☑ on the property or premises known as (name, description and/or location)

See Attachment A.

in the   SOUTHERN _____ District of   CALIFORNIA _____

there is now concealed a certain person or property, namely (describe the person or property to be seized)

See Attachment B.

which is (state one or more bases for search and seizure set forth under Rule 41(b) of the Federal Rules of Criminal Procedure)

Evidence of a crime and property used in committing a crime; contraband, fruits of a crime, and things criminally possessed;
and propery designed or intended for use or which is or has been used as a means of committing a criminal offense.

concerning a violation of Title  21 / 18 _____ United States code, Section(s)   841(a)(1), 843(b) and 846 / 1956

The facts to support a finding of probable cause are as follows:

See the attached Affidavit of Special Agent Brett O'Connor

Continued on the attached sheet and made a part hereof:    ☑ Yes    ☐ No

_____
Signature of Affiant

Sworn to before me and subscribed in my presence,

March  4 , 2008                                        at   San Diego, California
Date                                                           City                              State

_____              _____
Hon. Cathy Ann Bencivengo      U.S. Magistrate Judge         Signature of Judge
Name of Judge                     Title of Judge

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# ATTACHMENT A

## DESCRIPTION OF PROPERTY TO BE SEARCHED

The target premises located at 2825 Red Rock Canyon Road, Chula Vista, California is a two-story single family residence on the north side of Red Rock Canyon Road. The residence has an off-white stucco exterior with gray faux shutters on the second story windows facing the street. The front door to 2825 Red Rock Canyon Road is gray in color. The numerals "2825" are visible on the exterior wall of the residence, adjacent to the garage door, facing Red Rock canyon Road. .

The search shall include all  rooms, attics, crawl spaces, safes, briefcases, storage areas, containers, garages, sheds, carports, storage facilities and containers such as safes, vaults, file cabinets, drawers, luggage, briefcases, valises, boxes, jewelry boxes, cans, bags, purses, trash cans and vehicles located on or near the premises, that are owned or under the control of the occupants of such premises, evidenced by prior surveillance, possession of keys, maintenance paper work, title, insurance papers, or registration for such vehicles in the name of the occupants including: (1) the brown 2000 Lexus bearing California license plate number 5CHF845 that is registered to SAENZ; (2) a black 2006 Infinite SUV bearing California license plate number 5SKB807 that is registered to SAENZ; and (3) a silver 2002 Honda bearing California license plate number 4XCM609 that is registered to David or Ida SURPRISE.



# ATTACHMENT B

## ITEMS TO BE SEIZED

1. Documents containing data reflecting or memorializing the ordering, possession, purchase, storage, distribution, transportation and sale of controlled substances, including buyer lists, seller lists, pay-owe sheets, records of sales, log books, drug ledgers, personal telephone/address books containing the names of purchasers and suppliers of controlled substances, electronic organizers, Rolodexes, telephone bills, telephone answering pads, bank and financial records, and storage records, such as storage locker receipts and safety deposit box rental records and key.

2. Money, assets, and evidence of assets derived from or used in the purchase of controlled substances and records thereof, including but not limited to United States currency, negotiable instruments and financial instruments including stocks and bonds, and deeds to real property, books, receipts, records, bank statements and records, business records, money drafts, money order and cashiers checks receipts, passbooks, bank checks, safes and records of safety deposit boxes and storage lockers.

3. ~~Weapons, firearms, firearms accessories, body armor, and ammunition and documents relating to the purchase and/or possession of such items.~~

4. Documents and articles of personal property reflecting the identity of persons occupying, possessing, residing in, owning, frequenting or controlling the premises to be searched or property therein, including keys, rental agreements and records, property acquisition records, utility bills and receipts, photographs, answering machine tape recordings, telephone, vehicle and/or vessel records, canceled mail envelopes, correspondence, financial documents such as tax returns, bank records, safety deposit box records, canceled checks, and other records of income and expenditure, credit card records, travel documents, personal identification documents and documents relating to obtaining false identification including birth certificates, drivers license, immigration cards and other forms of identification which the same would use other names and identities other than his or her own.

5. All incoming telephone calls received at the residence during the execution of the search warrant and all calls received on cellular telephones found during the execution of the warrant.

6. Devices used to conduct counter-surveillance against law enforcement, such as radio scanners, police radios, surveillance cameras and monitors and recording devices and cameras.

7. Photographs and video and audio recordings which document an association with other coconspirators and/or which display narcotics, firearms, or money and proceeds from narcotics transactions.

8. Packages and contents that were delivered to the residence, or were about to be sent by the occupants.

9. Drug paraphernalia to include: distribution materials including scales, plastic baggies, electrical and duct tape, and other odor masking materials.

10. Police radio scanners, pagers, cellular telephones, facsimile machines, telephone answering machines, Caller ID system, and prepaid telephone cards.

11. Travel documents including itineraries, airline tickets, boarding passes, motel and hotel receipts, rental car receipts, passports and visas, credit card receipts, shipping and receiving documents relating to the delivery of packages.

1

12. Banking and financial institution records, bank statements, credit card statements, canceled checks, money orders, deposit slips, orders for or receipt of money transfer by wire, checking and saving books, financial institution statements, safe deposit boxes, loan statements, tax returns, business and personal ledgers, and accounting records.

13. Records relating to the lease of storage lockers, telephone/address directories and other papers containing telephone numbers and addresses.

14. Records related to the purchase of real estate, vehicles, precious metals, jewelry and other tangible assets.

15. Automotive parts and devices used to create clandestine compartments to hide large quantities of drugs and/or currency.

16. Digital storage devices including: floppy disk, CD ROMS, DVD ROMS, magnetic tapes, magnet optical cartridges, personal digital assistance, pagers, money chips, thumb drives, jump drives, flash drives, portable hard drives and computers containing hard drives. All electronic devices, such as computers, which include the central processing units, internal and external devices, internal and external storage equipment or media, terminals or video display units, together with peripheral equipment, such as keyboards, printers, modems, and programmable telephone dialing devices, and operating system software, program software, applications software, manuals for the software and hardware, electronic organizers, or personal digital assistants and computer discs and CD's, cellular telephones and SIM cards. All seized computers shall be returned to the defendants or the defendant's agent within 10 calendar days. If agents need more time than 10 days to complete the mirror imaging, the Government will seek from the Court an extension of time within which to return the applicable devices and/or equipment.

17. With respect to any and all electronically stored information in cellular phones and PDAs, agents may access, record, and seize the following:

a.    telephone numbers of incoming/outgoing calls stored in the call registry;

b.    Digital, cellular, and/or telephone numbers and/or direct connect numbers, names and identities stored in the directories;

c.    Any incoming/outgoing text messages relating to controlled substances offenses under 21 U.S.C. §§ 841(a)(1), 843(b), 846, and money laundering offenses under 18 U.S.C. § 1956;

d.    telephone subscriber information;

e.    the telephone numbers stored in the cellular telephone and/or PDA; and

f.    any other electronic information in the stored memory and/or accessed by the active electronic features of the digital or cellular phone including but not limited to photographs, videos, e-mail, and voice mail relating to controlled substances offenses under 21 U.S.C. §§ 841(a)(1), 843(b), 846, and money laundering offenses under 18 U.S.C. § 1956.

**AFFIDAVIT IN SUPPORT OF SEARCH WARRANT**

**UNITED STATES OF AMERICA** )
) SS
**SOUTHERN DISTRICT OF CALIFORNIA** )

I, Brett O'Connor, being duly sworn, hereby depose and say:

1.    I make this affidavit in support of an application for a search warrant in furtherance of an investigation conducted by special agents of the United States Drug Enforcement Administration ("DEA") for the premises located at 2825 Red Rock Canyon Road, Chula Vista, California (hereafter "the target location") described further in Attachment A.

2.    JOSE JESUS PERUCH SAENZ (hereafter "SAENZ") resides at the target location. On February 22, 2008, SAENZ was indicted in two separate cases, Criminal Case No. 08CR0509-BEN and Criminal Case No. 08CR0511-BEN, and charged with conspiracy to distribute oxycodone[1] and hydrocodone bitartrate[2] in violation of 21 U.S.C. §§ 846 and 841(a)(1), and multiple counts of distribution of oxycodone and hydrocodone bitartrate in violation 21 U.S.C. § 841(a)(1).

3.    The purpose of the search warrant is to seize (1) property that constitutes evidence of the commission of controlled substances offenses under 21 U.S.C. §§ 841(a)(1), 843(b), and 846, and money laundering offenses under 18 U.S.C. § 1956, (2) contraband, fruits of crime or things otherwise criminally possessed, and (3) property designed or intended for use or which is or has been used as a means of committing a criminal offense.

---

[1]    Oxycodone is a potent and potentially addictive opioid analgesic medication synthesized from thebaine. It is a Schedule II controlled substance both as a single agent and in combination with other products such as acetaminophen, ibuprofen, or asprin.

[2]    Hydrocodone is a narcotic which relieves pain by binding to opioid receptors in the brain and spinal cord. Pure hydrocodone, and forms containing more than 15 mg per dosage unit, are Schedule II controlled substances. Controlled purchases and seizures conducted over the course of this investigation to date have involved commercially prepared tablets of hydrocodone bitartrate with acetaminophen, consisting of less than 15 mg hydrocodone per dosage unit and constitute Schedule III controlled substances. All references found herein to "hydrocodone" refer to tablets consisting of hydrocodone bitartrate with acetaminophen.

4.     The information contained in this affidavit is based on my personal experience and training, consultation with other special agents of DEA, the Federal Bureau of Investigation ("FBI"), the Criminal Investigation Division of the Internal Revenue Service ("IRS"), officers of the San Diego Police Department ("SDPD") and other law enforcement officers. The evidence and information contained herein was developed from a review of intercepted wire and electronic communications pursuant to prior district court authorization, interviews with sources of information, financial documents secured by grand jury subpoena, surveillance records, vehicle records from the California Department of Motor Vehicles ("DMV"), and public records. Agents' interpretation of code words and phrases are described further in brackets("[ ]").

## EXPERIENCE AND TRAINING

5.     I have been employed as a Special Agent with the DEA since July of 2004. I am currently assigned to Enforcement Group Three within the San Diego Field Division. I have received extensive training in the field of narcotics enforcement. I have attended the DEA Academy at Quantico, Virginia for 16 weeks and have participated in narcotics investigations from street-level distributors to large-scale traffickers. I have interviewed and operated informants, executed search warrants, purchased drugs in an undercover capacity, arrested and interviewed subjects, conducted physical surveillance, utilized electronic and video surveillance, and testified in federal court. I have become familiar with the techniques and methods utilized by drug traffickers. In addition to the above-stated formal training, I have also worked with and consulted numerous agents and law enforcement officers who have investigated drug distribution and trafficking throughout the United States, including Southern California.

6.     In the course of my law enforcement experience, I have participated in investigations of crimes involving the importation and distribution of controlled substances and money laundering. I have arrested and participated in the arrests of numerous individuals for various controlled substance violations. I have participated in the execution of search warrants relating to illegal drug offenses. I have received training in the methods used by drug traffickers to import and distribute controlled substances and launder drug proceeds to promote the drug trafficking activity and conceal or disguise the nature, source, and ownership of the drug proceeds. I have conducted and participated in numerous

2

1  investigations involving surveillance of individuals associated with drug trafficking. I have conducted

2  and participated in numerous interviews of individuals involved with drug trafficking

3         7.      Based upon my experience and training, consultation with other law enforcement

4  officers experienced in controlled substances and financial investigations, and all the facts and opinions

5  set forth in this affidavit, I know that:

6                 a.      Individuals involved in drug trafficking often maintain at their residence records

7  and ledgers evidencing their trafficking activities in order to keep track of the ordering, purchasing,

8  storage, distribution and transportation of controlled substances. At times, the drugs may be sold, but

9  documentary records and ledgers often remain for long periods of time to memorialize past transactions,

10  the status of accounts receivable and accounts payable, and the names and telephone numbers of

11  suppliers, customers and coconspirators.

12                 b.      Individuals involved in drug dealing must often rely on others to obtain the

13  controlled substances and to help them market the drugs and evidence of the identities of these criminal

14  associates is often maintained at their residence and/or place of business.

15                 c.      Individuals involved in drug dealing utilize cellular telephones and personal

16  digital assistants ("PDAs") to maintain contact with co-conspirators and to conduct their criminal

17  activity. Drug traffickers use cellular phones and PDAs, in part, because of their belief in the inability

18  of law enforcement personnel to simultaneously track the originating and destination phone numbers

19  of calls placed to and from their cellular phones and PDAs. Cellular telephones and PDAs contain wire

20  and electronic data concerning telephonic contact, text messages, and electronic mail messages with co-

21  conspirators, as well as telephone books containing contact information for co-conspirators. Members

22  of drug trafficking and distribution organizations also utilize cell phones and PDAs with photograph and

23  video capabilities to take photographs and videos of other members of drug trafficking and distribution

24  organizations, drugs, money, and assets purchased with drug proceeds.

25                 d.      Based on prior searches of premises used by individuals involved in drug

26  trafficking, I believe I will find articles of personal property evidencing the identity of persons

27  occupying, possessing, residing in, owning, frequenting or controlling the premises or property therein.

28

1          e.    Individuals involved in drug trafficking will often conceal contraband and

2    evidence of their drug dealing in vehicles outside their residence in order to prevent detection and

3    seizure by officers conducting search warrants at the residence.

4          f.    Individuals involved in drug trafficking earn sums of money and often maintain

5    large amounts of United States Currency at their residence and often hide United States Currency in

6    safety deposit boxes at financial institutions, as well as safes, false compartments and other locations

7    inside their home.  Individuals involved in drug trafficking also try to conceal and disguise the nature,

8    source, and ownership of drug proceeds in a variety of ways including: (1) placing assets in names other

9    than their own to avoid detection while maintaining control; (2) laundering the money through what

10   appears to be a legitimate business or businesses; and (3) using the money to buy assets which are hard

11   to trace.  Substantial sums of United States Currency and records of financial transactions are often

12   found at the residence maintained by drug traffickers.

13         g.    Individuals involved in drug trafficking often send and receive packages

14   that contain contraband, money orders, and United States Currency.  Packages that contain contraband,

15   money orders, and United States Currency are often found at residences maintained by drug traffickers.

16         h.    Individuals involved in drug trafficking will often maintain weapons, firearms

17   and ammunition on their person or at their residence and cars in order to protect themselves and guard

18   their drugs and drug profits, and for enforcement purposes during their drug dealings.  These weapons

19   and firearms are used and can be used as an instrumentality of the drug trafficking and money

20   laundering crimes.

21         i.    Individuals involved in drug trafficking often take photographs of themselves,

22   their associates, their property, and their controlled substances.  Drug traffickers often maintain these

23   photographs at their residences or in their vehicles.  Therefore, I am requesting permission to search the

24   residences listed within this warrant and it's attachment(s) for and to seize photographs that law

25   enforcement agents determine to be of evidentiary value.

26         j.    Individuals engaging in drug transportation often use computers to

27   communicate with co-conspirators by means of electronic mail ("e-mail") and for the storage of records.

28   Moreover, I know that digital evidence can be stored on a variety of systems and storage devices

1 including: hard disk drives, floppy disk, CD ROMS, DVD ROMS, magnetic tapes, magneto optical

2 cartridges, personal digital assistance, pagers, money chips, thumb drives, flash drives, and portable hard

3 drives. Therefore, I am requesting permission to seize computers, including printers, monitors,

4 keyboards, scanners, and all forms of media storage that may be found at the residence.

5     8.    It is also my opinion and belief that the above-described documents are permanently

6 possessed by drug traffickers much the same way a legitimate business will maintain records and tools

7 of its trade whether or not the business has a particular item in inventory on a given date. These

8 documents are kept by drug traffickers whether or not the trafficker is in possession of any drugs at any

9 given moment. I believe that the seizure of such documents will provide evidence of the events set forth

10 in this affidavit and that such documents can be found in the residence despite any lapse of the time

11 between the events described and the anticipated search pursuant to this warrant.

12     9.    The investigation into the criminal activities of SAENZ and others reveals that the drug

13 distribution activities have been extensive and ongoing for several months. The investigation also

14 reveals that SAENZ transported drugs in his vehicles and may have stored drugs at the target location.

15 Due to the quantities of controlled substances distributed, and the assets acquired by SAENZ, I believe

16 SAENZ and others have been engaged in drug trafficking and possibly money laundering for a long

17 period of time. Consequently, I believe that there will be historical records of drug trafficking and

18 money laundering at the target location.

19 **OVERVIEW OF THE TARGET SUBJECTS**

20     10.    The following is a brief description of SAENZ, Karl DeLeon MURRAH, and Jesus

21 MACIAS, the target subjects whose drug trafficking activities provide probable cause for the search

22 warrant on the target location.

23     a.    **Jose Jesus Peruch SAENZ**, aka "G-Unit," aka "George" (date of birth:

24 05/26/1980) is a pharmacy technician at Galloway Pharmacy located in San Diego, California. SAENZ

25 was in charge of ordering pharmaceuticals, including oxycodone and hydrocodone bitartrate, for

26 Galloway Pharmacy.

27

28

1    b.    **Karl DeLeon MURRAH** (hereafter "MURRAH") (date of birth: 12/08/1978)

2  received large quantities of pharmaceuticals from SAENZ from at least February 2007 through August

3  2007 and then sold the pharmaceuticals to other individuals for further distribution.

4    c.    **Jesus MACIAS**, aka "Jessie," (hereafter "JESUS") (date of birth: 12/24/1983)

5  is a pharmacy technician at Galloway Pharmacy. JESUS worked with his brother, JUAN ERNESTO

6  MACIAS, JR., to distribute large quantities of pharmaceuticals to others for further distribution.

7                         **FACTS ESTABLISHING PROBABLE CAUSE**

8    10.    As discussed further, SAENZ was involved in two separate conspiracies to distribute

9  pharmaceuticals in violation of 21 U.S.C. §§ 846 and 841(a)(1): (1) SAENZ conspired with MURRAH

10  and others to distribute large amounts of pharmaceuticals that SAENZ diverted from Galloway

11  Pharmacy, and (2) SAENZ conspired with JESUS to divert pharmaceuticals from Galloway and

12  distribute pharmaceuticals to others.

13  **SAENZ conspired with MURRAH to distribute pharmaceuticals**

14    11.    In late 2003, the DEA opened an investigation into MURRAH's drug trafficking

15  activities. MURRAH had been identified by a confidential source of information as an ecstasy

16  distributor. During 2003, MURRAH sold ecstasy tablets to an undercover DEA agent (hereafter "the

17  UC") in Lemon Grove, California.

18    12.    On December 7, 2006, the UC met with MURRAH in National City, California. The

19  UC asked MURRAH if he was still moving "X" [ecstasy]. MURRAH said that he moved to "meds"

20  [pharmaceuticals] such as "OxyContin, Vicodin" (brand names for oxycodone and hydrocodone

21  respectively). MURRAH said that one can move a lot of "meds" because the demand was there.

22  MURRAH also said that there was lots of money in that area of business.

23    13.    On January 4, 2007, the UC met with MURRAH at a restaurant in San Diego.

24  MURRAH said that he was currently involved in the distribution of pharmaceuticals such as OxyContin

25  and Vicodin. MURRAH said that he made a lot of money selling pharmaceuticals by transporting large

26  amounts of pharmaceuticals to the East Coast. MURRAH indicated that there was a low supply of

27

28                                    6

1  OxyContin and that Vicodin was currently in high demand. MURRAH told the UC that he should begin

2  to do his business by doing his homework and starting a line of clients. MURRAH said that a good

3  client base could be found on the local college campuses.

4      14.    In 2007, agents initiated a Title III investigation of MURRAH's drug trafficking

5  activities. Throughout 2007, monitors intercepted over 200 calls and/or text messages regarding

6  pharmaceutical transactions and related financial transactions with SAENZ (MURRAH's primary

7  source of supply for pharmaceuticals) and several customers. Agents conducted approximately three

8  surveillances where SAENZ apparently distributed pharmaceuticals to MURRAH, and approximately

9  10 surveillances where MURRAH apparently distributed pharmaceuticals to customers. Law

10 enforcement officers seized pharmaceuticals from MURRAH's customers – directly after the customers

11 met with MURRAH – at least three times.

12     15.    On February 3, 2007, agents intercepted a call between MURRAH and Fereydoun

13 Shokrai regarding a pharmaceutical deal. During the call, Shokrai told MURRAH that he needed "30"

14 [hydrocodone tablets]. MURRAH acknowledged and the two agreed to meet before 5:00 p.m. that day.

15 During that evening, agents surveilled MURRAH's meeting with Shokrai in Chula Vista. After the

16 meeting, SDPD Officers stopped Shokrai for speeding and, during the traffic stop, found 30

17 hydrocodone tablets in a plastic bag on Shokrai's person.

18     16.    On February 21, 2007 at approximately 11:37 a.m., monitors intercepted a call

19 between MURRAH and SAENZ regarding a delivery of "two" [boxes of hydrocodone] to MURRAH

20 in exchange for "eight" [$8,000]. Agents subsequently observed MURRAH and SAENZ meet at Home

21 Depot in Chula Vista, California. At that time, SAENZ was wearing maroon medical scrubs and placed

22 a box of suspected pharmaceuticals into MURRAH's vehicle. Agents also observed SAENZ's

23 girlfriend, Gwenn Abagon SURPRISE, during the meeting

24     17.    On February 22, 2007, wire interceptions indicated that MURRAH planned to meet

25 with his source of supply and receive pharmaceuticals. Agents conducted surveillance and saw SAENZ

26 transfer a box into the trunk of MURRAH's vehicle.

27

28

18. On February 28, 2007 at approximately 2:14 p.m., monitors intercepted calls between MURRAH and SAENZ wherein MURRAH asked SAENZ about the availability of "two" [boxes of hydrocodone]. SAENZ replied "yep." MURRAH indicated that he would take both boxes when he got home later that night. Later that day, at approximately 9:35 p.m., agents observed SAENZ drive to MURRAH's residence in Chula Vista, California, and bring a large white bag into MURRAH's residence.

19. On March 7, 2007, at approximately 11:04 a.m., monitors intercepted a call between MURRAH and SAENZ. During the call, MURRAH asked SAENZ whether SAENZ could fill the order [of hydrocodone]. SAENZ told MURRAH that he could fill the order tomorrow. MURRAH confimed that the order was for "two" [boxes of hydrocodone].

20. On March 7, 2007, at approximately 11:38 a.m., monitors intercepted a call between SAENZ and MURRAH regarding oxycodone. During the call, SAENZ told MURRAH that SAENZ has "Chicas" [bottles of OxyContin]. MURRAH confirmed "oh, you got bitches" [bottles of OxyContin]. MURRAH said that he "ain't paying 3Gs [$3,000] for those things" [bottles of OxyContin]. SAENZ said "no 1250 [$1,250 per bottle of OxyContin], so like 25 [$2,500] total" [for both bottles of OxyContin]. SAENZ further said "it happened like last time. [SAENZ] just came across them." SAENZ said that "opportunity arrives." MURRAH said "okay, just grab them" [the bottles of OxyContin].

21. On March 7, 2007, at approximately 12:33 p.m., monitors intercepted a call between MURRAH and DIZON regarding MURRAH's ability to obtain oxycodone. During the call, MURRAH told DIZON those "bitches are kickin' it" [MURRAH had the bottles of OxyContin ready and waiting for DIZON]. DIZON said "yeah" and told MURRAH to let DIZON "hit him up" when DIZON got home off work. DIZON told MURRAH that he was "ready to kick it" [DIZON was interested in buying the OxyContin to distribute further]. At approximately 12:39 p.m., monitors intercepted a call where DIZON told MURRAH to "bring those girls out tonight" [requesting that MURRAH bring the bottles of OxyContin when MURRAH meets with DIZON later that night]. MURRAH replied "yeah."

22.     On March 8, 2007, the UC purchased 2,000 hydrocodone tablets from MURRAH. During this transaction, MURRAH produced a sealed box that was similar to the box from the February 22, 2007 transaction.     MURRAH opened the sealed box, which contained several bottles of hydrocodone tablets and gave four of the bottles, each containing 500 tablets for a total of 2,000 tablets, to the UC.

23.     On March 8, 2007, at approximately 9:50 p.m., monitors intercepted a call between MURRAH and SAENZ regarding an oxycodone deal.  During the call, SAENZ explained that "the girls [oxycodone] are at the pad [SAENZ's residence -- the target location]."

24.     On March 9, 2007 at approximately 11:14 a.m., monitors intercepted a text message where MURRAH told SAENZ: "OK I NEED SOME ZANEX [Xanex] ALSO."

25.     On March 9, 2007 at approximately 11:28 a.m., monitors intercepted a text message in which SAENZ asked MURRAH: "HOW MANY [bottles of Xanex do you want]?"

26.     On March 14, 2007, monitors intercepted a call between MURRAH and SAENZ regarding a pharmaceutical order.  During the call, SAENZ told MURRAH that he will most likely have "two" [boxes of hydrocodone] by Friday [March 16, 2007].

27.     On March 17, 2007, at approximately 10:19 a.m. -- and again at 10:21 a.m., 10:22 a.m., 10:23 a.m., 10:25 a.m., 10:27 a.m., 10:30 a.m., 10:32 a.m., 10:34 a.m., 10:40 a.m., 10:45 a.m., 10:51 a.m., 10:56 a.m., 11:02 a.m., and 11:12 a.m. -- monitors intercepted a text message from SAENZ to MURRAH. The text message stated: "LUNCH X2 N THA OTHER R READY 4 U!" [SAENZ had two boxes of hydrocodone bitartrate and an unspecified quantity of Xanax to be picked up by MURRAH].

28.     On March 17 ,2007, at approximately 12:45 p.m., monitors intercepted a call between MURRAH and SAENZ.  During the call, SAENZ told MURRAH that SAENZ "has two [boxes of] lunch [hydrocodone] and the other things, the zs[Xanax]."

29.     On March 18, 2007, monitors intercepted a call between MURRAH and SAENZ. During the call, SAENZ asked MURRAH, "Are you going to be available [to meet for a drug transaction] today?" MURRAH replied, "Yeah." SAENZ then said, "I'll call you in, in like two hours, I'll be home."

9

30.     On March 19, 2007, agents searched through the trash located at the target location. From the trash at the target location, agents seized three white bottles with Watson labels: Hydrocodone Bitartrate and Acetaminophen - 10 mg-325 - 500 count (including one bottle with a Galloway inventory sticker on the bottom), two shipping labels addressed to SAENZ, bank receipts, and other documents.

31.     On March 19, 2007, agents also searched through the trash at MURRAH's residence in Chula Vista. Among the trash at MURRAH's residence, agents found two empty boxes similar to the pharmaceutical boxes previously mentioned from February 22, 2007 and March 8, 2007, and an empty pharmaceutical bottle similar to the bottles purchased by the UC on March 8, 2007 with a Watson label: Hydrocodone Bitartrate and Acetaminophen - 500 count.

32.     On March 27, 2007, monitors intercepted a text message from SAENZ to MURRAH. The text message stated: "ONE LUNCH TIL SAT." [In this message, SAENZ told MURRAH that he (SAENZ) will have one box of hydrocodone on Saturday, March 31, 2007, at which time SAENZ may obtain more.] At approximately 11:45 a.m., monitors intercepted a text message from SAENZ to MURRAH. The text message stated: "I GOT SICK. IM STIL A LIL BIT. BUT IM NOT SURE IF UR READY, 1 LUNCH N MAYBE 2 BITCHES!" [In this text message, SAENZ told MURRAH that he (SAENZ) has one box of hydrocodone and possibly two bottles each containing 100 tablets of 80 milligram OxyContin]. At approximately 11:48 a.m., monitors intercepted a text message from MURRAH to SAENZ. The text message stated: "IM READY BUT IM IN VEGAS TIL FRIDAY. CALL." [In this text message, MURRAH confirmed that he was ready to purchase the hydrocodone and OxyContin, but he was in Las Vegas, Nevada, not in San Diego, California.] At approximately 11:50 a.m., monitors intercepted a text message from SAENZ to MURRAH. The text message stated: "OK, LET JUS DO IT SAT. I'LL HAVE 2 LUNCH BY THEN." [In this text message, SAENZ told MURRAH that he would have two boxes of hydrocodone by Saturday, March 31, 2007.]

32.     On March 31, 2007, monitors intercepted a call between MURRAH and SAENZ. During the call, MURRAH asked SAENZ if he was working that day. SAENZ said that, while he was not working at Galloway Pharamacy, "lunch [hydrocodone] is still available" and that SAENZ would

1  have "lunch" [hydrocodone] by 2:00 p.m.  SAENZ asked MURRAH if MURRAH wanted the "two"

2  [boxes of hydrocodone] and MURRAH confirmed that he still wanted the boxes of hydrocodone.

3      33.    On March 31, 2007 at 11:53 a.m., monitors intercepted a call between MURRAH and

4  Ramond Andrew DIZON.  During this call, MURRAH told DIZON that MURRAH had "two bitches

5  at chillin' at two" [MURRAH had two bottles of OxyContin to sell to DIZON priced at $2,000 per

6  bottle]. MURRAH said "two at two" and DIZON replied "alright." [DIZON confirmed that he was

7  interested in buying the two bottles of OxyContin for $2,000 a piece.]  MURRAH also told DIZON that

8  MURRAH was "stocking up on lunch [hydrocodone]."

9      34.    On March 31, 2007, at approximately 3:38 p.m., monitors intercepted a call between

10  MURRAH and SAENZ.  During the call, SAENZ told MURRAH that "lunch [hydrocodone] is ready."

11      35.    On March 31, 2007, at approximately 10:15 p.m., monitors intercepted a call between

12  MURRAH and SAENZ.  During the call, MURRAH told SAENZ that MURRAH wanted to meet

13  SAENZ at 11:00 and told SAENZ to bring "the z's and everything" [Xanax and other pharmaceuticals].

14      36.    On June 20, 2007, agents utilized a pole camera to observe SAENZ walk to his vehicle

15  in the Galloway Pharmacy employee parking lot and place a box (similar to the pharmaceutical boxes

16  mentioned above from February 22, 2007, March 8, 2007, and March 19, 2007) into the trunk of his

17  vehicle.  Agents followed SAENZ and the vehicle he placed the box into and observed SAENZ drive

18  from Galloway Pharmacy to the target location.  SAENZ then parked in the garage of the target location

19  and closed the garage door prior to exiting his vehicle.

20      37.    On July 11, 2007, agents intercepted a text message from SAENZ to MURRAH.  The

21  text message stated: "GOT MAIL THANKS."  On July 12, 2007, agents intercepted a text message

22  from MURRAH to SAENZ that stated: "SAME THING."

23      38.    On Saturday, July 14, 2007, agents intercepted a call between MURRAH and DIZON

24  where MURRAH said that he was "having lunch" [receiving an order of hydrocodone] on Monday [July

25  16, 2007].  DIZON told MURRAH that he would "be cool" with "six" [6,000 hydrocodone tablets] and

26  "three" [three bottles of OxyContin].    During the call, MURRAH told DIZON "I got all my e-mails.

27  That's how we're [MURRAH and SAENZ] talking . . . via e-mail through the I-phone." Later in the call,

28

11

1    DIZON asked MURRAH "if he's [SAENZ] cool or what's up?" MURRAH replies, "yeah, yeah. I'll

2    tell you about it when I see you." MURRAH further said that "he [SAENZ] is still good and active."

3          39.    On July 15, 2007, at approximately 12:59 p.m., monitors intercepted a text message

4    between MURRAH and SAENZ. MURRAH sent the message "CHECK MAIL" to SAENZ.

5          40.    On July 15, 2007, at approximately 8:34 p.m., monitors intercepted a call between

6    MURRAH and SAENZ. During the call, SAENZ told MURRAH that he would be "right there."

7    MURRAH replied that he was at the gas station. In a later call, MURRAH told SAENZ that he was "at

8    the security gate." At approximately 9:25 p.m. on July 15, 2007, agents intercepted a call between

9    MURRAH and DIZON. During the call, MURRAH informed DIZON that he could not meet for dinner

10   because he was too busy "grabbing lunch" [obtaining hydrocodone]. DIZON informed MURRAH that

11   he could always "have lunch" [obtain hydrocodone] after dinner.

12         41.    On July 25, 2007, at approximately 5:53 p.m., monitors intercepted a text message

13   between MURRAH and SAENZ. SAENZ sent the message, "CHK [check] MAIL" to MURRAH.

14         42.    On August 17, 2007 at approximately 8:53 p.m., monitors intercepted a call between

15   MURRAH and SAENZ regarding pharmaceuticals. During the call, MURRAH asked SAENZ, "how

16   many boxes [each box containing 12 bottles and each bottle containing 500 tablets of hydrocodone] you

17   got, one or two?" SAENZ replies, "one, I'll be over there [over to MURRAH's house]."

18         43.    On August 17, 2007 at approximately 11:44 a.m., monitors intercepted a text message

19   from SAENZ to MURRAH that stated: "CHECK MAIL."

20         44.    On August 17, 2007, at approximately 11:48 a.m., monitors intercepted a text message

21   from MURRAH to SAENZ. In the text message, MURRAH stated: "ALWAYS HUNGRY" [Agents

22   believe that, in this text message, MURRAH informed SAENZ that he (MURRAH) would purchase

23   hydrocodone bitartrate from SAENZ whenever it was available].

24

25

26

27

28

**SAENZ Conspired With JESUS MACIAS To Distribute Pharmaceuticals**

45.    In addition to his conspiracy with MURRAH, SAENZ conspired with JESUS to divert pharmaceuticals from Galloway Pharmacy for further distribution to others. SAENZ was in charge of ordering pharmaceuticals for Galloway Pharmacy and ordered pharmaceuticals on behalf of JESUS.

46.    On July 18, 2007, at approximately 11:26 a.m., monitors intercepted a text message between SAENZ and JESUS regarding a pharmaceutical order. JESUS sent the text message, "HEY WHAT'S UP WITH THE YELLOWS [hydrocodone]? DID THEY COME IN?" to SAENZ.

47.    A confidential source of information for the FBI ("CI")[3] purchased pharmaceuticals from JESUS and JUAN multiple times. During a consensually recorded conversation on July 24, 2007, JUAN told the CI that his brother [JESUS] was getting the hydrocodone and oxycodone.

48.    On July 25, 2007, monitors intercepted a text message between SAENZ and JESUS. In the text message, JESUS stated: "HEY…ARE YOU ABLE TO ORDER ME 4 BOTTLES OF THE YELLOWS? THROUGH VALLEY? I'M NOT WORKING FRIDAY AND SAT. THAT IS WHY…" to SAENZ. During a subsequent consensually recorded call, JUAN advised the CI that his brother [JESUS] had ordered four bottles of hydrocodone.

49.    On July 27, 2007, the CI purchased two bottles of OxyContin and three bottles of hydrocodone from JUAN.

50.    On September 29, 2007, CI purchased two bottles of OxyContin and eight bottles of hydrocodone from JESUS and JUAN.

51.    On October 12, 2007, CI purchased four bottles of OxyContin and four bottles of hydrocodone from JESUS and JUAN.

---

[3]    CI pled guilty to felony drug charges in state court and is awaiting sentencing. On April 17, 2007, CI entered into a Cooperation Agreement with the FBI and the San Diego District Attorney's Office. Pursuant to the agreement, CI agreed to plead guilty to felony charges in state court and assist law enforcement in return for a possible reduction in sentencing. On November 26, 2007, the San Diego District Attorney's Office concluded the Cooperation Agreement by telling CI that he will not receive any further punishment for his/her state felony charges as a result of the cooperation CI had provided thus far. CI then entered into a second Cooperation Agreement with the FBI and the San Diego District Attorney's Office. Pursuant to the second Cooperation Agreement, CI agreed to continue to assist law enforcement in return for a reduction of his/her felony state charges to a misdemeanor. As of December 5, 2007, CI has been reimbursed $2,100 by the FBI for his/her expenses. The information provided by CI has been corroborated and has proven to be reliable.

1    52.    On December 3, 2007, CI purchased three bottles of OxyContin, from JESUS and

2    JUAN.

3    53.    On January 23, 2008, CI purchased two bottles of OxyContin from JESUS and JUAN.

4    **Financial Analysis of SAENZ**

5    54.    Agents compared SAENZ's reported earnings on the tax records from the California

6    Employment Development Department ("EDD") for the years 2004 through 2007 with the cumulative

7    deposits into SAENZ's multiple bank accounts for the same years.

8    55.    For 2004, EDD tax records reflect that SAENZ received earnings of $19,422.01, and

9    bank records reflect cumulative deposits of $38,912.79 -- a difference of $18,995.22.

10    56.    For 2005, EDD tax records reflect that SAENZ received earnings of $19,684.94, and

11    bank records reflect cumulative deposits of $51,221.81 -- a difference of $31,536.87.

12    57.    For 2006, EDD tax records reflect that SAENZ received earnings of $20,917.95, and

13    bank records reflect cumulative deposits of $70,713.13 -- a difference of $49,795.18.

14    58.    For 2007, EDD tax records reflect that SAENZ receive earnings of $17,097.21, and

15    bank records reflect cumulative deposits of $93,668.49 -- a difference of $76,571.28.

16    59.    In summary, for the years 2004 through 2007, SAENZ's tax records reflect reported

17    cumulative earnings of $77,617.67, while SAENZ's bank records for the same period reflect cumulative

18    deposits of $254,516.22 -- a difference of $176,898.55.  Agents believe that the disparity between the

19    amount of SAENZ's reported earnings and the amount of SAENZ's cumulative deposits may be the

20    proceeds of drug trafficking.

21    **SAENZ's Connection to Target Location**

22    60.    Agents obtained utility records from the San Diego Gas and Electric (SDG&E)

23    pertaining to the target location.  The utility records indicate that Gwen SURPRISE  maintains the

24    SDG&E account for the target location.  SURPRISE is SAENZ's girlfriend and resides at the target

25    location. Agents have observed SURPRISE and SAENZ together on several occasions, including on

26    February 22, 2007, when SAENZ met with MURRAH to complete a drug transaction.  On several

27    occasions, agents have observed SAENZ deliver pharmaceuticals in a silver 2002 Honda sedan bearing

28

14

1  California license plate number 4XCM609 registered to David or Ida Surprise, the parents of Gwen

2  SURPRISE.

3      61.    Agents obtained telephone subscriber information from Cox Communications which

4  indicated that SAENZ has a telephone subscribed to his name under the target location address and the

5  account was activated since February 26, 2007.

6      62.    Information obtained through Grand Jury indicates that in March of 2007, SAENZ

7  opened a checking and money market account through Wells Fargo using the target location as his

8  address on the application.  Records indicate that as of June 2007 the account was still active.

9      63.    SAENZ, or vehicles known to be utilized by SAENZ, have been observed on numerous

10  occasions at the target location.  A vehicle associated with SAENZ was seen at the target location as

11  recently as February 13, 2008.

12      64.    Agents have observed SAENZ drive the following vehicles:  (1) a brown 2000 Lexus

13  bearing California license plate number 5CHF845 that is registered to SAENZ; (2) a black 2006 Infinite

14  SUV bearing California license plate number 5SKB807 that is registered to SAENZ; and (3) a silver

15  2002 Honda bearing California license plate number 4XCM609 that is registered to David or Ida

16  SURPRISE.  Agents have observed these vehicles parked near the target location.    Agents have

17  specifically observed the brown 2000 Lexus and the 2002 Honda during drug transactions with SAENZ.

18                          **SEARCH PROTOCOL FOR COMPUTERS**

19      65.    This section describes the procedures that will be employed during this search to

20  minimize the intrusion represented by the search of any electronic data found at the target location.

21      66.    Searching agents will be asked to use an incremental approach in searching for relevant

22  electronic material.  If the agents are able to examine relevant portions of computer drives to identify

23  responsive material within a reasonable time period on-site, then the agents will attempt to create

24  forensic images of computers or laptops seized.  However, if the agents cannot perform the search

25  within a reasonable period on-site, will they employ alternate procedures to complete the review off-site.

26  In that case, the computer expert will create forensic images of electronic data sources as necessary to

27  complete the search off-site.

28

                                    15

67.    A forensic image is an exact physical copy of a computer hard drive or other similar electronic storage media. A forensic image thus captures all of the data on the hard drive (or other media) without the data being viewed and without changing the data in any way. There are many reasons why it is not feasible to conduct a forensic analysis of data on-site. First, analysis of the data following the creation of the forensic image is a highly technical process that requires specific expertise, equipment and software. Second, there are literally thousands of different hardware items and software programs that can be commercially purchased, installed and custom-configured on a user's computer system. Third, it is only after a thorough examination and analysis, that a trained computer forensic examiner can determine whether he needs to obtain specialized hardware or software (not to mention specialized training on the specialized software) in order to view and analyze the data contained in electronic form.

68.    The analysis of data on a computer may also be an extremely tedious and time consuming process. In addition, to requiring special technical skills, equipment and software, it may take days to properly search a single hard drive for specific data. With current technology, each search "hit" must be reviewed in its context by an agent to determine whether the data is within the scope of the warrant. In other words, merely finding a good "hit" does not end the review process.

69.    Analyzing data on-site has become increasingly impossible as the volume of data stored on a typical computer system has increased. For example, a single gigabyte of storage space (i.e., 1,000 megabytes) is the equivalent of 500,000 double-spaced pages of text. Computer hard drives capable of storing 100s of gigabytes of data are becoming quite common in newer desktop computers.

70.    In addition to the sheer volume, the data may be stored in a variety of formats or encrypted. The volume of data of course extends the time that it takes to analyze the image in a laboratory. Running keyword searches takes longer and results in more hits that must be individually examined for relevance. Moreover, certain file formats do not lend themselves to keyword searches (e.g., many common electronic mail, database and spreadsheet applications do not store data as searchable text).

1        71.     Based on the foregoing, searching any computer or forensic image for the information

2   subject to seizure pursuant to this warrant may require a range of data analysis techniques and may

3   require off-site analysis.

4        72.     Nevertheless, all forensic analysis of the imaged data will be directed exclusively to

5   the identification and seizure of information within the scope of this warrant.  In the course of proper

6   examination, the forensic examiner may view information that is potentially privileged or not within the

7   scope of the warrant.  If so, this information will not be made available to the investigating agents unless

8   it appears to the examiner that the information relates to the commission of offenses not covered by this

9   warrant.  In that event, the examiner will confer with the investigator and/or the prosecuting attorney

10   so that they can determine whether to seek a further search warrant for the newly uncovered data.

11        73.     All seized computers shall be returned to the defendants or the defendant's agent within

12   10 calendar days.  If agents need more time than 10 days to complete the mirror imaging, the

13   Government will seek from the Court an extension of time within which to return the applicable devices

14   and/or equipment.

15              **SEARCH PROTOCOL FOR CELLULAR TELEPHONES AND PDAS**

16        74.     With respect to any and all electronically stored information in cellular phones or

17   PDAs at the target locations, agents respectfully request that this Court authorize the agents to access,

18   record, and seize the following:

19          a.     telephone numbers of incoming/outgoing calls stored in the call registry;

20          b.     Digital, cellular, and/or telephone numbers and/or direct connect numbers,

21   names and identities stored in the directories;

22          c.     Any incoming/outgoing text messages regarding violations of 21 U.S.C. §§

23   841(a)(1), 843(b), 846, or 18 U.S.C. § 1956;

24          d.     telephone subscriber information;

25          e.     the stored telephone numbers dialed from the cell phone and/or PDA; and

26

27

28

1          f.      any other electronic information in the stored memory and/or accessed by the

2   active electronic features of the digital or cellular phone including but not limited to photographs,

3   videos, e-mail, and voice mail regarding violations of 21 U.S.C. §§ 841(a)(1), 843(b), 846, or 18 U.S.C.

4   § 1956.

5          75:     If the agents cannot analyze the cellular telephone or PDA on site, they may send the

6   cellular telephone or DPA to the Regional Crime Forensic Lab (RCFL) or the DEA Digital Lab to all

7   analysts or forensic examiners to examine, analyze, and make a record of the contents of the information

8   stored in the seized cellular telephone or PDA.

9                          **CONCLUSION AND SEALING REQUEST**

10         76.     Based on my training and experience, consultation with other special agents and law

11  enforcement officers, and all of the facts and opinions set forth in this affidavit, there is probable cause

12  to believe that federal crimes have been committed, including controlled substances violations under

13  21 U.S.C. §§ 841(a)(1), 843(b), and 846, and money laundering violations under 18 U.S.C. § 1956.

14  There is also probable cause to believe that property constituting evidence of the offenses, contraband,

15  fruits of crime or things otherwise criminally possessed, and property designed or intended for use or

16  which is or has been used as a means of committing the criminal offenses will be found in the target

17  location described further in Attachment A.

18

19

20

21

22

23

24

25

26

27

28

1    77.    Because this is an ongoing investigation and premature disclosure of the investigation

2 could endanger agents and officers, cause the target subjects and others to flee and cause destruction of

3 evidence, I request that this affidavit, the application for the search warrant, the search warrant, and all

4 other associated court records be sealed until further court ordered.

5    I declare under penalty of perjury that the foregoing is true and correct.

6

7

8    BRETT O'CONNOR
     Special Agent
     Drug Enforcement Administration

9

10

11 Sworn to and subscribed before me
   this ____4____ day of March, 2008.

12

13

14 HONORABLE CATHY ANN BENCIVENGO
   United States Magistrate Judge

15

16

17

18

19

20

21

22

23

24

25

26

27

28

19